**WARD, KEENAN & BARRETT, P.C.**
Gerald Barrett, State Bar No. 5855
3838 North Central Ave., Suite 1720
Phoenix, Arizona  85012
Tel: (602) 279-1717
Fax: (602) 279-8908
gbarrett@wardkeenenbarrett.com

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky *Pro Hac Vice application pending*
Timothy J. MacFall *Pro Hac Vice application pending*
Samir Aougab *Pro Hac Vice application pending*
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
(516) 683-3516

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Ryan Carlson, derivatively on behalf of Opendoor Technologies, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>John Rice, Eric Wu, Adam Bain, Cipora Herman, Jonathan Jaffe, Pueo Keffer, Jason Kilar, Glenn Solomon, and Carrie Wheeler,<br><br>Defendants,<br><br>and<br><br>Opendoor Technologies, Inc.,<br><br>Nominal Defendant. | Case No._____<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Ryan Carlson ("Plaintiff"), by and through his attorneys, brings this derivative complaint for the benefit of nominal defendant Opendoor Technologies, Inc. ("Opendoor" or the

"Company") against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following upon information and belief, except as to those allegations concerning himself, which are alleged upon personal knowledge. Plaintiff's information and belief as to all other matters is based upon, among other things his counsel's investigation, which includes a review and analysis of: (i) filings in various proceedings, including a class action lawsuit alleging violations of federal securities laws captioned Alich v. Opendoor Technologies, Inc., Case No. 2:22-cv-01717 (D. Ariz.) (the "Securities Action"); (ii) Opendoor's filings with the U.S. Securities and Exchange Commission (the "SEC"); (iii) Opendoor's press releases, website, corporate governance documents, presentations, and conference calls; and (iv) analyst reports and other publicly available information concerning Opendoor.

## NATURE OF THE ACTION

1.      This stockholder derivative action is brought on behalf of Opendoor against the Individual Defendants from at least December 21, 2020 to September 16, 2022 (the "Relevant Period"), for issuing, and/or causing the issuance of, materially false and misleading statements and/or omitting material facts from statements that caused other statements to be materially false and misleading, regarding the algorithm used by the Company to make offers to buy homes (the "Algorithm").

2.      Opendoor operates a digital platform for buying and selling residential real estate.

3.      The Company's platform includes a feature known as "iBuying," which uses an algorithm to purportedly allow the Company to make accurate market-based offers to sellers and then sell those homes to buyers for a profit.

4.     On December 21, 2020, the Company went public via a special purpose acquisition company ("SPAC"), a process that includes merging with a public, development-stage "blank check company" (the "Merger"). Following the Merger, Opendoor's common stock and warrants began publicly trading on the Nasdaq Stock Market ("NASDAQ") under the symbols "OPEN" and "OPENW," respectively.

5.     After the close of the Merger on December 21, 2020, Opendoor's common stock was trading at $31.25 per share (the "Initial Closing Price").

6.     Throughout the Relevant Period, the Individual Defendants caused the Company to utilize "iBuying" technology, claiming that it could accurately price homes by adjusting to market conditions in "real-time."

7.     In reality, the Algorithm failed to accurately respond to changing market conditions, and as a result, Opendoor faced substantial risk of incurring significant and repeated losses due to housing market fluctuations.

8.     The truth emerged on September 19, 2022, when *Bloomberg* reported that the Company had lost money on 42% of its transactions in August 2022. That report further revealed that losses were even more prevalent in key markets including Los Angeles, California and Phoenix, Arizona, where the Company incurred losses on 55% and 76% of its transactions, respectively. Further, the *Bloomberg* report included a prediction by real estate analyst Mike DelPrete who opined that September would be even worse for Opendoor.

9.     On this news, Opendoor's stock price fell 12.32% to close at $3.56 on September 20, 2022, a staggering 88.61% decline from the Initial Closing Price of $31.25.

10.     Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

3

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), and SEC Rule 10b-5, 17 C.F.R. §§240.10b-5, promulgated thereunder. This Court has jurisdiction over the subject matter of this action under §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331 because this is a civil action arising under the laws of the United States of America.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Individual Defendants have conducted business in this District, and the Individual Defendants' actions have had an effect in this District.

**THE PARTIES**

*Plaintiff*

16.     Plaintiff holds shares of Opendoor and has been a continuous holder of the Company's common shares at all relevant times.

*Nominal Defendant*

17.     Nominal Defendant Opendoor is a Delaware corporation with its principal executive offices located in Tempe, Arizona. The Company's common stock and warrants trade on the NASDAQ under the ticker symbols "OPEN" and "OPENW," respectively.

*The Individual Defendants*

18.     Defendant Eric Wu ("Wu") has served as the Chief Executive Officer ("CEO") of Opendoor and the Chairman of the Board at all relevant times. According to the Company's public filings, Wu received $370,240,992 in 2020 and $112,333,540 in 2021 in compensation from the Company.

19.     Defendant John Rice ("Rice") has served as a member of the Board since March 2021 and serves as a member of the Board's Nominating and Corporate Governance Committee. According to the Company's public filings, Rice received $627,711 in compensation from the Company in 2021.

20.     Defendant Adam Bain ("Bain") has served as a member of the Board since December 2020 and serves as a member of the Board's Audit Committee and Compensation Committee. According to the Company's public filings, Bain received $282,896 in compensation from the Company in 2021.

21.     Defendant Cipora Herman ("Herman") has served as a member of the Board since December 2020 and serves as chair of the Board's Audit Committee. According to the

Company's public filings, Herman received $636,877 in compensation from the Company in 2021.

22.     Defendant Jonathan Jaffe ("Jaffe") has served as a member of the Board since June 2018 and serves as a member of the Board's Nominating and Corporate Governance Committee. According to the Company's public filings, Jaffe received $263,726 in compensation from the Company in 2021.

23.     Defendant Pueo Keffer ("Keffer") has served as a member of the Board since October 2015 and serves as a member of the Board's Audit Committee. According to the Company's public filings, Keffer received $274,421 in compensation from the Company in 2021.

24.     Defendant Jason Kilar ("Kilar") has served as a member of the Board since March 2019 and serves as chair of the Board's Nominating and Corporate Governance Committee. According to the Company's public filings, Kilar received $274,421 in compensation from the Company in 2021.

25.     Defendant Glenn Solomon ("Solomon") has served as a member of the Board since February 2015 and serves as chair of the Board's Compensation Committee. According to the Company's public filings, Solomon received $280,077 in compensation from the Company in 2021.

26.     Defendants Rice, Bain, Herman, Jaffe, Keffer, Kilar, Solomon, and Wu comprised the Board at all relevant times and are herein referred to as the "Director Defendants."

27.     Defendant Carrie Wheeler ("Wheeler") has served as the Chief Financial Officer ("CFO") of Opendoor at all relevant times. According to the Company's public filings, Wheeler

received $50,275,445 in 2020 and $350,000 in 2021 in compensation from the Company. In December 2022, Wheeler became the CEO of Opendoor and joined the Board.

28.     The Director Defendants and Defendant Wheeler are collectively referred to herein as the Individual Defendants.

**THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

29.     By reason of their positions as officers, directors, and/or fiduciaries of Opendoor, and because of their ability to control the business and corporate affairs of the Company, at all relevant times, the Individual Defendants owed Opendoor and its shareholders the fiduciary obligations of trust, good faith, loyalty, and candor, and were required to use their utmost ability to control and manage the Company in an honest and equitable manner.

30.     The Individual Defendants were required to act in furtherance of the best interests of Opendoor and its shareholders so as to benefit all shareholders equally and not in furtherance of their own personal interest or benefit.

31.     Each director and officer of the Company owes to Opendoor and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. To discharge their duties, the officers and directors of Opendoor were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Opendoor were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable district and

state laws, rules, regulations and requirements, and all contractual
obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with
the public and with shareholders are made with due candor in a timely and
complete fashion;

(d)     Maintain and implement an adequate system of internal legal, financial,
and management controls to ensure that Opendoor's operations would
comply with all laws and that Opendoor's regulatory filings filed with the
SEC and disseminated to the public and the Company's shareholders
would be accurate; and

(d)     When put on notice of problems with the Company's business practices and
operations, exercise good faith in taking appropriate action to correct the
misconduct and prevent its recurrence.

32.     The Individual Defendants had a duty to monitor the Company's operations to
maximize profitability. The Individual Defendants, however, failed to adequately monitor the
performance of the Company's iBuying technology, and the flawed Algorithm upon which it is
based, causing the Company to incur losses on 42% of its real estate transaction in August 2022,
with losses on 55% and 76% of its transactions in key markets including Los Angeles, California
and Phoenix, Arizona, respectively.

33.     The Individual Defendants had a duty to prevent the dissemination of erroneous,
misleading, and deceitful information concerning, inter alia, the Company's financial condition,
business operations, management, performance, growth, earnings, and business prospect so that
the Company's valuation and the common stock price would be based on accurate information,
and to preclude deceptive practices in the market.

34.     The Individual Defendants, because of their positions of control and authority,
were able to and did, directly or indirectly, exercise control over the wrongful acts complained of
herein, as well as the contents of the various public statements issued by Opendoor.

35.     Each of the Individual Defendants breached his or her fiduciary duties as alleged
herein, both individually and in concert with the other Defendants.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

36.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to incur losses through the use of flawed technology and conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

37.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

38.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

39.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors or officers of Opendoor, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

40.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

41.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Opendoor and at all times acted within the course and scope of such agency.

## OPENDOOR'S CODE OF BUSINESS CONDUCT AND ETHICS

42.     Opendoor's Code of Business Conduct and Ethics (the "Code of Conduct"), adopted by the Board on December 18, 2020 and re-approved on December 7, 2021 and December 8, 2022, includes the Company's commitment to "upholding the highest standards of business conduct and ethics."

43.     The Code of Conduct explicitly applies to "every employee, officer and director" of Opendoor.

44.     In a section titled "We Maintain Financial Integrity," the Code of Conduct states, in relevant part:

> In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the Securities and Exchange Commission (the "SEC"). Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Team members who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about Opendoor that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:
>
> ● No team member may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations.

● All team members must cooperate fully with our Accounting Team, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete.

● No team member should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

45.    In the section titled "We Conduct Business Fairly," the Code of Conduct States, in relevant part, that Opendoor is "committed to doing business with fairness, integrity and honesty."

46.    In the section titled "We Safeguard And Protect Our Company Assets," the Code of Conduct states, in relevant part, that "[a]ll team members are expected to protect [the Company's] assets and ensure their efficient use."

## OPENDOOR'S AUDIT COMMITTEE CHARTER

47.    Opendoor's Audit Committee Charter, adopted by the Board September 30, 2021 and re-approved December 8, 2022, states that the purpose of the Audit Committee is, among other things, to "oversee the accounting and financial reporting processes of the Company."

48.    In the section titled, "Oversight of Financial Reporting Process and Internal Controls," the Audit Committee Charter states that the Audit Committee will review:

(i)     the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Company's internal audit function, if any, through inquiry and discussions with the Company's independent auditors, management and the Company's corporate controller or chief accounting officer, if any; and

(ii)    if applicable, the yearly report prepared by management, and attested to by the Company's independent auditors, assessing the effectiveness of the Company's internal control over financial reporting and stating

management's responsibility for establishing and maintaining adequate internal control over financial reporting prior to its inclusion in the Company's Annual Report on Form 10-K.

49.     In the same section, the Audit Committee Charter states that the Audit Committee will review with management:

(i)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(ii)    any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

50.     The Audit Committee Charter further states that the Audit Committee will "[d]iscuss guidelines and policies governing the process by which senior management of the Company assess and manage the Company's exposure to risk, as well as the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures."

51.     With respect to Opendoor's Code of Conduct, the Audit Committee Charter states that the Audit Committee will "[r]eview the Company's program to monitor compliance with the Company's Code of Ethics and Business Conduct."

52.     At all relevant times alleged herein, Defendant Herman has served as chair of the Audit Committee, and Defendants Bain and Keffer have served as members of the Committee.

## SUBSTANTIVE ALLEGATIONS

53.     Prior to the Relevant Period, Opendoor was known as Social Capital Hedosophia Holdings Corp. II ("SCH") and was operated as a SPAC, which is a development-stage corporation listed on a stock exchange with no particular business plan or purpose other than to

acquire an unidentified private company, thus making it public without going through the traditional public offering process.

54.     On September 15, 2020, the Company, then operating as SCH, entered into a definitive agreement for a merger with Legacy Opendoor, a private company operating as a digital platform for buying and selling residential real estate ("the Merger Agreement"). The Merger Agreement valued Legacy Opendoor at $4.8 billion.

55.     On October 5, 2020, the Company filed a registration statement on Form S-4 with the SEC in connection with the Merger (the "Registration Statement"). The Registration Statement was signed by Defendant Wu. After multiple amendments, the Registration Statement was declared effective by the SEC on November 27, 2020.

56.     On November 30, 2020, the Company filed a proxy statement on Form 424(b)(3) with the SEC in connection with the Merger (the "Proxy" and, together with the Registration Statement, the "Offering Documents"). The Proxy was signed by Defendants Bain and Herman.

57.     On December 18, 2020, the Company consummated the Merger, whereby SCH deregistered as a Cayman Islands Exempted Company, domesticated as a Delaware corporation, and changed its name to "Opendoor Technologies, Inc."

58.     On December 21, 2020, the Company's common stock and warrants began trading on the NASDAQ under the symbols, "OPEN" and "OPENW," respectively.

59.     Since the Merger, the Company has operated a digital platform for buying and selling residential real estate. The Company's platform includes a feature known as "iBuying," which uses an algorithm to purportedly allow the Company to make accurate market-based offers to sellers and then sell those homes to buyers for a profit.

60.     The Offering Documents for the Merger were negligently prepared and, as a result, contained false and misleading statements of material fact. Additionally, throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.

61.     The false and misleading statements contained in the Offering Documents and issued by Defendants throughout the Relevant Period overstated the benefits of the Company's "iBuying" technology.

62.     Specifically, Defendants failed to disclose that the Algorithm used by Opendoor to make offers did not accurately reflect home values across different market conditions and economic cycles and that as a result, the Company faced substantial risk of incurring significant and repeated losses due to fluctuations in real estate markets.

63.     The truth emerged on September 19, 2022, when Bloomberg reported that, based on the prices at which the Company had bought and sold properties, Opendoor had lost money on 42% of its transactions in August 2022. The report demonstrated that Opendoor's Algorithm was unable to accurately adjust to changing market conditions, stating, in relevant part:

> [Opendoor], which sells thousands of homes in a typical month, lost money on 42% of its transactions in August, according to research from YipitData. Opendoor's performance — as measured by the prices at which it bought and sold properties — was even worse in key markets such as Los Angeles, where the company lost money on 55% of sales, and Phoenix, where the share was 76%.
>
> The losses, which don't include fees charged to customers or expenses incurred in renovating and marketing homes, have been looming since the housing market turned suddenly in recent months.
>
> *          *          *
>
> The company's rocky summer is reminiscent of the pricing problems that doomed Zillow Group Inc.'s iBuying business last year, according to a research note from Mike DelPrete, a scholar-in-residence at the University of Colorado Boulder. That doesn't mean Opendoor is going to shut down the business, but it demonstrates

the depth of the losses — and September is likely to be even worse than August, DelPrete's analysis shows.

"Opendoor's metrics are in the danger zone," DelPrete said in an interview. "They are very close to where Zillow was in its worst moments."

The iBuying model relies on acquiring homes, making light repairs and reselling the properties — often within a few months of the initial purchase . . . . [D]windling affordability and mortgage rates soaring toward 6% this spring finally pushed would-be buyers to the sidelines.

By June, median home prices had begun to decline in some areas, especially the Sun Belt markets that had been frothiest in the pandemic boom days. The shift caught Opendoor by surprise, leaving it to offload thousands of properties it had agreed to purchase when prices were rising.

*   *   *

The shares slid 4.7% to $3.87 at 3:28 p.m. New York time Monday. They were down 72% this year through the close on Sept. 16.

64. Following the Bloomberg report, the Company's stock price fell 12.32% over the following day to close at $3.56 per share on September 20, 2022. This was a staggering 88.61% decline from Opendoor's stock price of $31.25 per share immediately after the Merger on December 21, 2020.

**False and Misleading Statements Contained in the Offering Documents**

65. The Offering Documents touted the Company's "world-class data science capabilities," stating:

While the real estate industry lends itself to the use of a plethora of publicly sourceable data, much of this data lacks the quality and specificity essential to accurately price homes. Since Opendoor's founding, we have built world-class data science capabilities and systematized tooling to gather, aggregate and synthesize an expanding catalogue of proprietary, hyperlocal data in order to improve and automate pricing decisions.

66. With respect to the proprietary offline data used by the Algorithm, the Offering Documents stated:

15

We have conducted over 150,000 home assessments during which we collect over 100 data points on each home and its surroundings. We have invested in building custom inspection and operator tooling to systematically source and translate home features into a robust data library. Once we have purchased a home, we can collect additional proprietary home-level data through visitor feedback, visitor traffic and duration of visits. These proprietary data points have led us to make over one billion annotations and corrections to Multiple Listing Services ("MLS") and tax assessor data, as well as build out new, non-traditional geospatial data assets, such as power line proximity and road noise level. The additional home level data we collect from local vendors provides structured feedback on each home and further strengthens our data moat.

67.    The Offering Documents specifically touted the "pricing accuracy" of the Algorithm and its purported ability to respond to changing market conditions:

Our unique data works in concert with our pricing algorithms. These algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management. Over time, we have improved the pricing accuracy of our models as we add new data inputs and refine model logic, improvements that compound with experience and scale. As we have continued to demonstrate improving accuracy, we have also been able to increase our number of fully automated home valuations.

Advancements in model sophistication have accelerated our feedback loops, such that our systems can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions. Our pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions. This responsiveness is critical to pricing accurately and maintaining margins, especially in periods of volatility.

68.    These statements were materially false and misleading and omitted material facts. The Offering Documents overstated the benefits of the Company's "iBuying" technology, stating that the data used by the Algorithm had "the quality and specificity essential to accurately price homes" and claiming that the Algorithm would enable the Company to "react to real-time economic conditions." In reality, the Algorithm could not accurately adjust to changing market conditions and, as a result, the Company faced a substantial risk of incurring significant and

16

repeated losses. Indeed, Opendoor ended up losing money on 42% of its transactions in August 2022.

**False and Misleading Statements After the Merger**

69.     On March 4, 2021, Opendoor filed an annual report on Form 10-K with the SEC (the "2020 10-K") which repeated the statements contained in the Offering Documents regarding the Company's proprietary Algorithm and its purported pricing accuracy and ability to react to changing market conditions.

70.     On February 24, 2022, Opendoor filed an annual report on Form 10-K with the SEC (the "2021 10-K"), signed by Defendants Wu, Wheeler, Bain, Herman, Jaffe, Keffer, Kilar, Rice, and Solomon. The 2012 10-K included substantively the same statements contained in the Offering Documents regarding the Company's proprietary Algorithm and its purported pricing accuracy and ability to react to changing market conditions.

71.     With respect to improvements made to the proprietary offline data used by Opendoor's Algorithm, the 2021 10-K stated, in relevant part:

> We have conducted approximately 375,000 assessments during which we collect over 100 data points on each home and its surroundings. We have invested in building custom inspection and operator tooling to systematically source and translate home features into a robust data library. These proprietary data points have led us to make approximately 1.4 billion annotations and adjustments to MLS and tax assessor data, as well as build out unique geospatial data assets, such as power line proximity and road noise level. Once we list a home for resale, we collect additional home-level demand data such as home visits and visitor feedback, which enable us to continuously calibrate our resale strategy and acquisition home pricing.

72.     In the 2021 10-K, Defendants touted the Company's use of the Algorithm to make offers that accurately reflect home values:

> To create our home offers, we algorithmically produce both an estimated offer price and an assessment of our confidence level in that estimate, and we then further validate that estimate with in-depth underwriting and risk assessment, including additional review from our in-house pricing associates, to finalize the offer. We

dynamically adjust our offers to account for the level of certainty in pricing each home. This degree of certainty can be impacted by factors such as macro conditions, the condition or attributes of a home, or depth of home comparables. We are constantly recalibrating our view of pricing and where market values are trending using high- frequency detailed metrics across all segments of our business, including numerous inputs related to the dynamics of market demand and supply across markets, home types and time periods.

73.     With respect to risk management, the 2021 10-K stated:

Since our inception, we have prioritized investment in our pricing capabilities across our home acquisition processes and our forecasting and resale systems, and expect to continue to do so. These investments pair with a strong risk management focus that is embedded in our pricing, finance and operations teams. We evaluate the quality of our pricing models and processes using high-frequency detailed metrics across all segments of our business, including home acquisition, resale strategy and inventory health. All of our pricing decisions are managed centrally, giving us a high degree of control over our overall growth and margin objectives.

74.     Additionally, the 2021 10-K assured shareholders that "[w]hile residential real estate markets are subject to fluctuations, as with any market, we believe we are well- positioned to manage our risk exposure due to", among other things, Opendoor's "pricing models and inventory management systems [that] are designed to recalibrate to market signals on a daily basis."

75.     The 2021 10-K further touted the Algorithm's pricing accuracy and ability to adjust to market conditions in "real-time," stating:

[C]hanging market conditions are reflected in our pricing for new acquisitions, largely leaving previously-acquired inventory at risk to potential market volatility. In addition, we employ sophisticated resale pricing management systems that allow us to optimize sell-through and margin using real-time, local market demand information, including down to an individual home level. We believe that the quality and scale of information we utilize in our inventory management decisions and our ability to manage these decisions across a scaled, diversified portfolio provides us with a structural advantage over individual sellers or agents in the traditional home selling process.

76.     The statements contained in the 2021 10-K were materially false and misleading and omitted material facts. The statement that "changing market conditions are reflected in our

pricing for new acquisitions" was materially false and highly misleading because the Algorithm used by the Company to make offers failed to accurately adjust to changing market conditions. Accordingly, Opendoor was not "well-positioned to manage [the Company's] risk exposure."

77.     On August 4, 2022, Opendoor issued a press release (the "August 4, 2022 Press Release"), announcing the Company's second quarter 2022 results, including third quarter adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") guidance of $(175) million to $(125) million.

78.     Despite reporting that the Company could lose as much as $175 million in adjusted EBITDA in the third quarter of 2022, Defendant Wu continued to reassure shareholders and the public, quoted in the August 4, 2022 Press Release as stating, "[C]urrent market volatility is requiring us to move swiftly and with discipline in managing risk and overall inventory health. We are leveraging our responsive pricing and operations platform . . . to operate from a position of strength and solidify our leadership as the category winner."

79.     That same day, Defendants Wu and Wheeler issued a letter (the "August 4, 2022 Letter") to shareholders, stating that, while "the Fed's aggressive rate hikes . . . catalyzed a slowdown in the rate of home transactions and lower levels of home price appreciation," Opendoor's investments in its platform "have enabled an agile and low cost operating system that allows [the Company] to scale up and down gracefully across seasons and cycles," and the Company is "ready and well-positioned with [Opendoor's] responsive price strategies, flexible operating model, low cost structure, and strong balance sheet to navigate near-term volatility and invest in the future of [the Company]."

80.     On a conference call with analysts on August 4, 2022 (the "August 4, 2022 Conference Call" and, together with the "August 4, 2022 Press Release" and the "August 4, 2022

Letter," the "August 4, 2022 Statements"), Defendant Wheeler stated that, despite the volatile housing market, "our systems are doing exactly what they're designed to do, which is responding very, very quickly, adjusting prices to market and we've been raising spreads and new acquisitions."

81.     The August 4, 2022 Statements were false and misleading and omitted material facts. In reality, the Algorithm used by the Company to make offers failed to accurately reflect market prices. Indeed, over the course of the following month, Opendoor incurred losses on 42% of its transactions due to the Algorithm's inability to "respond[] very, very, quickly" to changing market conditions.

82.     Analysts and the market credited Defendants' August 4, 2022 Statements. On August 5, 2022, as a result of these false and misleading statements, Opendoor's stock price increased 21.7%.

## **DAMAGE TO OPENDOOR**

83.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred and will continue to incur significant financial losses, including but not limited to, the losses incurred on a substantial amount of Opendoor's transactions and the costs of defending and potentially paying class wide liability in the Securities Action.  These damages also include the costs of remediating deficiencies in the Company's Algorithm, deficiencies in the Company's internal controls, compensation and benefits paid to the Individual Defendants, who breached their duties to Opendoor, and reputational harm and loss of goodwill.

**DERIVATIVE ALLEGATIONS**

84.     Plaintiff brings this action derivatively for the benefit of Opendoor to redress injuries suffered and to be suffered as a proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

85.     Plaintiff will adequately and fairly represent the interests of Opendoor and its stockholders in enforcing and prosecuting its rights.

86.     Plaintiff is an owner of Opendoor common stock and has been a continuous holder of the Company's common shares at all relevant times.

**DEMAND FUTILITY ALLEGATIONS**

87.     At the time this action was commenced, the nine-member Board was comprised of Defendants Wu, Wheeler, Bain, Herman, Jaffe, Keffer, Kilar, Rice, and Solomon. Accordingly, Plaintiff is required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

88.     The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants failed to adequately monitor the performance of the Company's iBuying technology and the Algorithm upon which it is based, which caused the Company to incur losses on 42% of its transactions in August 2022. The Director Defendants

also authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

89. The Director Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Director Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

90. As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Opendoor, the Director Defendants knew, or should have known, the material facts surrounding the Algorithm used by the Company for its "iBuying" technology.

91. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

92. Defendants Bain, Herman, and Keffer are not disinterested or independent, and therefore, are incapable of considering a demand because they serve as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, inter alia,

public disclosure requirements.  Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Algorithm used by the Company to make offers to purchase homes and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Bain, Herman, and Keffer cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

93.     Further, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Director Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Opendoor stock and stock options they held.

94.     The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Opendoor's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

95.     Furthermore, demand in this case is excused because the Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each

other. These conflicts of interest precluded the Director Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the Director Defendants would be futile.

96.     Significantly, none of the Director Defendants have taken remedial action to redress the conduct alleged herein.

97.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

98.     The acts complained of herein constitute violations of fiduciary duties owed by Opendoor's officers and directors, and these acts are incapable of ratification.

99.     The Director Defendants may also be unprotected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Opendoor. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Opendoor, there would be

no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

100.    If there is no directors' and officers' liability insurance, then the directors will not cause Opendoor to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

101.    Thus, for all of the reasons set forth above, all of the directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### COUNT I

**Against the Individual Defendants for Violations of § 10(b)**
**of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

102.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

104.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

105.     The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

106.     The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Opendoor were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

107.     The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Opendoor, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Opendoor, participated in the fraudulent scheme alleged herein.

108.     As a result of the foregoing, the market price of Opendoor's common stock was artificially inflated during the Relevant Period. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of the Company's common stock in purchasing Opendoor common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

109.     In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## COUNT II

**Breach of Fiduciary Duty**
**Against the Individual Defendants**

110.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

111.     The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligations of good faith, candor, loyalty, and due care.

112.     The Individual Defendants failed to adequately monitor the performance of the Company's iBuying technology, and the Algorithm upon which it is based, causing Opendoor to incur losses on a substantial number of the transactions in which it engaged in August 2022. The Individual Defendants thereby willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

113.     The Individual Defendants, together and individually, violated and breached their fiduciary duties of good faith, candor, loyalty, and due care. Specifically, the Individual Defendants breached their fiduciary duties by willfully or recklessly: (i) making and/or authorizing false and misleading statements and material omissions regarding the Algorithm used by the Company to make offers to buy homes; (ii) failing to correct and/or causing the

Company to fail to correct these false and misleading statements and omissions; and (iii) failing to establish and/or oversee reasonable information, oversight and reporting systems, and internal controls.

114.    The Individual Defendants made and/or authorized false and misleading statements concerning the Algorithm used by the Company to make offers to buy homes, and the adequacy of the Company's financial reporting and internal controls, because, inter alia, they failed to disclose that the Algorithm used by the Company was unable to accurately respond to changing market conditions, and as a result, the Company was exposed to substantial risk of incurring significant and repeated losses due to housing market fluctuations.

115.    The Individual Defendants further breached their fiduciary duties by failing to ensure that reasonable information and reporting systems existed with respect to the Algorithm and the adequacy of the Company's public reporting.

116.    The Board either failed to institute an oversight system concerning the performance of the Company's Algorithm and these critical public reporting systems  or consciously disregarded a series of related red flags. Despite being made aware of these red flags warning that the Company's Algorithm did not perform as publicly represented, and that the statements issued, or caused to be issued, by the Individual Defendants were materially false and misleading, the Board failed to act.

117.    The Individual Defendants also breached their fiduciary duties by failing to take remedial action against the other Defendants and by concealing the other Individual Defendants' fraudulent statements and material omissions.

118.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Opendoor has sustained significant damages as alleged herein, including

28

the costs of defending itself, and the exposure to massive class-wide liability, in the Securities Action. As a result, the Individual Defendants are liable to the Company.

119.    Plaintiff, on behalf of Opendoor, has no adequate remedy at law.

### COUNT III

**Unjust Enrichment**
**Against the Individual Defendants**

120.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

121.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Opendoor.

122.    The Individual Defendants were unjustly enriched because of the compensation they received while breaching their fiduciary duties owed to Opendoor.

123.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

124.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

125.    Plaintiff, on behalf of Opendoor, has no adequate remedy at law.

**COUNT IV**

**Aiding and Abetting Breaches of Fiduciary Duty**
**Against the Individual Defendants**

126.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

128.    Plaintiff, on behalf of Opendoor, has no adequate remedy at law.

**COUNT V**

**Waste of Corporate Assets**
**Against the Individual Defendants**

129.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

130.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Opendoor's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

131.    The Individual Defendants wasted corporate assets by, among other things, incurring repeated losses on a substantial amount of the Company's real estate transactions and paying defense costs in connection with the Securities Action.

132.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

133.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

134.     Plaintiff, on behalf of Opendoor, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Opendoor and that Plaintiff is a proper and adequate representative of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.     Directing Opendoor to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Opendoor and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions;

D.     Awarding to Opendoor restitution from the Individual Defendants;

31

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 1st day of March, 2023.

**WARD, KEENAN & BARRETT, P.C.**

By: *s/Gerald Barrett*_____
Gerald Barrett, State Bar No. 5855 3838
N. Central Avenue, Suite 1720
Phoenix, AZ 85012
Tel.: (602) 279-1717
Fax: (602) 279-8908
gbarrett@wardkeenenbarrett.com

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Tel.: (302) 295-5310
Fax: (302) 654-7530

*Attorneys for Plaintiff*

*Of Counsel:*

Joshua H. Grabar
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (267) 507-6085

**Certificate of Service**
I hereby certify that on the 1st$^{h}$
day of March, 2023, I electronically
transmitted the foregoing to the Clerk
of the U.S. District Court using the
CM/ECF System for filing and transmittal.

s/Mary Farley_____